Poullain *et al.* vs. Brown, administrator, and *vice versa.*

1. The sending by an administrator of cotton belonging to the estate beyond the jurisdiction of the State, is a *devastavit per se,* and no evidence of good faith or good intention should be received to relieve him or his sureties from the consequences of such illegal act; nor would he be justified in so shipping cotton to prevent its seizure by treasury agents of the government, the presumption being that cotton seized by the agents of the government is legally seized. If illegally seized, the administrator would have his remedy.

(a) The market meant by ₴2555 of the code, to which the administrator may send annual crops, is a domestic market within the jurisdiction of the courts of this State.

(b) The rule of the common law as to the control and disposition by

an administrator of personal property of the decedent, has been changed by statute, with exemption as to annual crops sent off to market.

2. Where an administrator hired laborers and carried on the farm of the decedent without the approval of the ordinary, any loss thereby sustained would not fall upon the estate, and should not be allowed the administrator.

3. The sureties on the bond of this administrator were not to any extent released by the facts that his successor in that office was also administrator of a decedent who was a co-surety on the bond, and distributed the assets of the estate of that co-surety to heirs and creditors thereof before bringing this suit.

4. The verdict was authorized by the evidence.

5. The judgment complained of in the original bill of exceptions being affirmed, the cross-bill of exceptions is dismissed.

September 16, 1889.

Bonds. Administrators and executors. *Devastavit.* Principal and surety. Crops. Sales. Presumptions. Evidence. Verdict. New trial. Practice. Before Judge Jenkins. Green superior court. March adjourned term, 1888.

This case was once before in the Supreme Court, (80 *Ga.* 27,) and the pleadings in it up to that time will be found sufficiently reported in the decision rendered by Justice Blandford. The case had been referred to an auditor, who had reported various liabilities of the defendants, as sureties on the bonds given by Seabrook as administrator *de bonis non*, and administrator *de bonis non* with the will annexed, of George O. Dawson. One of his findings was as follows : That sixty bales of cotton went into the hands of Seabrook, administrator, between the dates of the signing of the first and second bonds, which cotton he endeavored to ship out of Georgia, and on the Flint river *en route* to Liverpool it was damaged by the sinking of the boat carrying it; that fifty-one bales of it were sold in Apalachicola, Fla., and nine in Liverpool, the entire sixty bringing $1,395 ;

that this action of Seabrook was illegal and at his risk; that the cotton was worth at Albany, Ga., the point whence shipped, thirty-five cents per pound, and estimating the bales at 500 pounds each, it was worth in Albany $10,500 gross; and that this amount would have been reduced by legitimate expenses of sale, viz. factor's commissions one per cent. $105, weighing at fifty cents per bale $30, which added to the $1,395 accounted for leaves $8,970, for which he should account. In summing up, the auditor finds that this loss on cotton was an act of waste committed before the second bond was given, and therefore both defendants are liable for it as sureties.

The exceptions of fact as to the cotton shipped, as to which the verdict was against the defendants, are as follows, in brief: (7) The auditor erred in holding that Seabrook's action in this regard was illegal, defendants alleging that said action involved purely a question of fact, viz. his *bona fides;* that is, if at the time he honestly thought such act to be for the best interest of the estate, and in performing it he exercised all the care and diligence which a prudent man would have put forth in the management of his own affairs, neither he nor his sureties would be liable for the loss; and exceptants allege that he did so act, and that the loss was occasioned by the act of God. (8) The auditor erred in estimating the cotton lost as weighing 500 pounds per bale, there being no evidence before him as to its weight. (9) He erred in reporting as to the weight of the cotton and its value in Albany at the time as thirty-five cents, or as to what the expenses in the way of commission, storage and weight were; all these conclusions of the auditor being without evidence to support them, upon which he found against defendants the sum certain of $8,970; all of which was contrary to law.

The testimony reported by the auditor to the court, bearing on the shipment in question, may be briefly stated as follows : The appraisement of the estate of Dawson, in which there was stated, as belonging to the estate and as having been produced to the appraisers by Seabrook, administrator, sixty-nine bales of cotton at 35 cents; this appraisement made July 23, 1866, and accompanied by the usual oath of Seabrook, administrator, as to the correctness of the inventory.  Attached to it is a statement by Seabrook that he thought it best to ship sixty of the sixty-nine bales before selling it; that money was scarce in Albany, and cotton, especially the cotton of persons prominent in the late war, was exposed to seizure by agents of the government, and even when improperly seized by them, the cost to realize it was always considerable, and in many cases a very large sum as compared to the value of the cotton ; that therefore he concluded to move sixty bales out of the Confederate States before selling them, insuring it on the voyage ; that, residing in Columbus, he applied to Washam Cromwell, a man of character, intelligence and experience in the cotton business, to effect the shipping and insuring of this cotton, and Cromwell applied to H. L. Bowers, of the same place, an insurance agent of established reputation, for insurance on the cotton, and Bowers said that the cotton not being in his insurance district, he could not take the risk, but would get it insured, which he could do by reason of his business relations with an insurance agent in Albany, Y. G. Rust, and wrote to Rust (a copy of the letter being attached) asking him to find Oliver Cromwell and get particulars of how he shipped two lots of cotton to Apalachicola, one of fifty and the other of sixty bales, and to insure them to that point and send bills to Bowers and he would remit by express, and stating that W. Cromwell

expected Bowers to insure them, but found after his son left that Bowers could not; also inquiring as to the Albany cotton market, and quoting middling cotton at Columbus at 35 cents; this letter being dated February 6, 1866; that it was answered by Rust on February 9, 1866, by letter attached, acknowledging receipt of Bowers' letter, and saying: "Mr. Cromwell is now shipping sixty bales cotton by the steamer White Rose now loading at this place; the other fifty bales he will not be able to get off in time for the boat, but will ship them next week. The treasury agent has seized one bale of his cotton, the producer being a subscriber to the cotton loan. Middling cottons worth to-day 33c." Also that, on receipt of this reply, Bowers assured Cromwell that the cotton was insured, Cromwell reported the assurance to Seabrook as entirely trustworthy, and he, believing it, considered the cotton as insured; that a few days afterwards the White Rose, with the cotton on board, left Albany, for Apalachicola, and on February 19, 1866, as she was proceeding down the Flint river, she struck a rock and sank, whereby the cotton was so much damaged as to be almost a total loss, and after deducting salvage and other expenses, the net proceeds would be but a small sum compared to the value of the cotton; that Oliver Cromwell soon afterwards called on Rust, in behalf of Seabrook, for the insurance, which Rust refused to pay, saying that he had been paid no premium, a pretext which it was then too late to make available, as he had by his conduct accepted the terms contained in the Bowers letter, which were to insure the cotton and send the bill to Bowers, who would remit by express, and his acceptance had been communicated to Seabrook by his agents and acted on by them, and the cotton had been shipped in reliance on such acceptance; that consequently Seabrook, under advice

of counsel, had brought suit against Rust and the Underwriters' Agency for the damage to the cotton; and that he felt that his action in the matter was all that could be expected of a careful and prudent man.

The only return made by Seabrook, administrator, (which was filed July 7, 1868,) charged him with $1,-395.73 as the net proceeds of the sixty bales, and credited him with certain sums for storage, drayage, etc thereon. It was agreed by counsel that the record of the case of *Seabrook, adm'r, vs. The Underwriters' Agency,* as reported in 43 *Ga.* 583, and all the facts shown by that report, might be considered as in evidence. On the question as to whether there was any real danger or cause for uneasiness as to the seizure of the cotton by government agents at the time in question, there was some conflict in the evidence. Witnesses for the plaintiff testified that there was no cause for uneasiness in 1865, and no such seizure was made within their knowledge; and that, as to such seizures, there seemed to be no discrimination between those who had been officers and those who had been private soldiers in the Confederate army. There was some uneasiness felt about seizure of cotton up to February, 1866; and where one witness (Brightwell) lived, there was some cotton seized by a government agent, but there were 300 bales in the same place which were not touched. For the defendants J. A. Billups testified that, in December, 1865, or January, 1866, he shipped about 40 bales of cotton to Augusta through one Bruce, who had established communication with Liverpool. He endeavored to ship it to Liverpool, where it was worth 51 cents per pound; was led to do so by reason of danger of seizure by the United States government, and the prospect of better prices. About this time frequent seizures were made

all through Georgia by persons claiming to be govern-
ment agents, resulting in loss to those whose cotton
was so seized. He did not know whether or not there
was a market for cotton in the country towns. The
whole country was greatly demoralized, and there was
little money in the section about Greene county. As to
the value of the cotton at the time, in addition to what
has been stated, the evidence is meagre. One witness
for plaintiff swore that, in the fall of 1867, cotton was
worth from ten and a half to eleven cents per pound,
there being little offered for sale in small places and the
market not being good. In the account sales of cotton
attached by Seabrook, administrator, to his return,
under date of January 1, 1866, nine bales are quoted as
having been sold at 33 cents per pound; and under date
of October 17, 1866, eight bales at $31\frac{1}{2}$ cents per pound;
these two items not being any part of the cotton said to
have been shipped for Liverpool. Another witness for
the plaintiff swore that he thought that, in 1866, cotton
was worth 20 cents, and in 1867 from ten to twelve and
a half cents per pound. As to the number of pounds
contained in each bale, the only testimony in the record
is such as may apparently be gathered by inference from
the fact that the nine bales above referred to as sold on
January 1, 1866, and the eight bales sold October 17,
1866, each weighed over 500 pounds.

After verdict, the defendants moved for a new trial
on the following among other grounds:

(1–3) The verdict is contrary to law and evidence.

(4) Error in rejecting the amended plea of the release
*pro tanto*, set out in the third division of the opinion.

(7) Error in rejecting the following portion of Va-
son's testimony, on the ground that it was irrelevant
and incomplete: Vason lived in Albany from 1865 to
1873 inclusive, and knew Dawson, a Confederate officer,

whose cotton, if on hand in 1866 or 1867, was liable to be seized by treasury agents, and it would have been prudent to have shipped it down the river to avoid such seizure. Vason had cotton, and all of it that was ginned and packed was seized; some that was packed after the war he sold in Albany, and it was immediately shipped to Europe. Many persons shipped theirs down the river, but Vason did not know what was done with the Dawson cotton. After 1865, 1866 and 1867, there was less danger of seizure. The treasury agents were very watchful, examining all cotton; they disappeared soon after 1868, when civil government was restored.

(8) Error in rejecting the following portion of Vason's testimony, on the ground of want of diligence in procuring it, it not having been adduced before the auditor but being newly discovered : Vason was acquainted with the Dawson farm. Large prices were paid for superintendents for such farms in 1866–67; Vason paid about $1,500 in cotton. An English company, owning three large plantations, paid $1,000 per month, besides having an overseer for each. $2,000 was liberal pay. The high price of cotton, and the fact that preference was given to men of education and character in choosing superintendents, were the reasons why so much was paid. Vason's recollection was, that the Dawson farm was a ten or twelve horse farm; if so, the superintendent was entitled to $1,200 and his " sub" to $600 ; this was about the average ; non-residents paid more.

(9) The court refused to charge thus :   " It was the duty of Seabrook, administrator of George O. Dawson, to sell the annual crops raised on the plantation of said deceased, not on the plantation but in the market ; it was also his duty to exercise discretion in the selection

of the market, and to use ordinary diligence in the preservation of such crops (in this case cotton); also to use the same care and diligence in managing the transportation and sale of the cotton that ordinarily prudent men would have done in their own business; and his good faith in every transaction is a question for you to determine under the evidence in this case; and if you believe, from the evidence in this case, that Seabrook in good faith sought to benefit the estate by making an effort to send the cotton to a market outside of the State of Georgia, and in the attempt to do so exercised the care and diligence that ordinarily prudent men exercise in their own business; and notwithstanding his good faith, his care and diligence, the whole or a part of said cotton was lost, Seabrook, if in life, would not be liable for such loss, nor are his sureties, the defendants in this case, liable therefor, and you should sustain the 7th exception to the auditor's report.

(10) The court refused to charge thus: " If you believe from the evidence in this case that Seabrook, or the former administrator of George O. Dawson's estate, Lucian W. Dawson, made contracts in good faith for labor or services with persons of color or with white persons for the benefit of said George O. Dawson's estate for the year 1866, said contracts were valid and binding, and any moneys paid out by said Seabrook under such contracts are properly chargeable against the estate of George O. Dawson, and the defendants, Poullain and Davis, are not liable for the same, and you should sustain exception 6th filed by defendant Poullain to the auditor's report holding him liable for $1,297.19 on the ground that the farm was run in 1866 without an order of court and without any authority of law."

(11) Error in the charge set out in the first head of the opinion.

(12) Error in rejecting the testimony of J. A. Billups, which was before the auditor and reported by him. (This is set out in the foregoing part of the report.)

The motion was overruled, and the defendants excepted. The plaintiff filed a cross-bill of· exceptions, not now necessary to report.

J. A. BILLUPS, H. D. McDANIEL, FOSTER & BUTLER, D. B. SANFORD, C. HEARD and W..H. BRANCH, for Poullain *et al.*·

H. T. & H. G. LEWIS, BARROW & THOMAS and H. McWHORTER, *contra.*

SIMMONS, Justice. ·

James L. Brown, administrator *de bonis non,* etc. of Dawson, brought his action against Thomas N. Poullain, as surety on the administrator's bond of Seabrook, and also brought another action against Poullain and Ann C. Davis, administratrix of her husband, as sureties on another administrator's bond of Seabrook. Both cases, involving the same issues, were consolidated in the court below. The plaintiff recovered, and the defendants made a motion for a new trial on the several grounds set out therein, which motion was overruled; and they excepted.  ·.  ¯

The main ground relied on ˉby counsel for the ·plaintiffs in error for reversal of the court below, was alleged error in the following charge of the court to the jury, and the exclusion of certain evidence hereinafter detailed : " The court charges you that an administrator has, by law, no authority to ship or remove beyond the limits of this State property in his hands belonging

to the estate of his testator or intestate, as the case may be, and such act, if committed, would be illegal; and if in consequence of such act the property of the estate is damaged, it would amount to a *devastavit*, for which the administrator and his sureties would be liable on their bond to the extent of the damage sustained by the estate. This the court charges you to be the law applicable to all administrators in the management of estates."

It appears from the record in this case that Seabrook, the administrator, in the year 1866, undertook to ship a certain number of bales of cotton belonging to the estate of his intestate, from Albany, Georgia, to Liverpool; that after the cotton had been placed on board the steamer at Albany, and the steamer had started down the river to Apalachicola, it ran upon a snag and sank, and the cotton was lost. Seabrook, in his returns to the court of ordinary of Dougherty county, attached to the returns an explanation, and gave his reasons for shipping the cotton to Liverpool. These reasons, in substance, were, that he thought it was for the best interest of the estate to make the shipment, because he could obtain a much better price in Liverpool than in the markets of Georgia, and that he was fearful that the cotton would be seized by the treasury agents of the general government. On the trial of the present case in the court below, Colonel Billups was offered by the defendants as a witness to prove that he had attempted about the same time to ship cotton to Liverpool, where it was worth 51 cents per pound, and that he was led to do so by reason of danger of seizure by the United States government, and the prospect of better prices; that frequent seizures were made all through Georgia by persons claiming to be agents of the government, resulting in loss to those whose cotton was seized. This evidence

was excluded by the judge, and this ruling is also complained of. Upon this state of facts the above charge was given.

1. We do not think this charge was erroneous. We think it was a correct exposition of the law of this State concerning the duties and liabilities of executors and administrators. They are *quasi* officers of the courts of ordinary. Their duties in regard to the sale of the property belonging to the estates of their decedents, are well defined. In all cases of sales by them, except of annual crops and wild land, the mode and the means of fixing the time and place of sale are prescribed by law. If the law is followed by them in this respect, and the sale conducted fairly, they are not liable, whether the property brings much or little. " Under the common law, the absolute control of the personal property of the decedent was vested in the executor or administrator, and he had the legal power to dispose of any or all of such property at discretion. He could sell the personal property either at private or public sale. If he sold at private sale, he was chargeable with the full value of the property rather than the price obtained." Schouler Exrs. and Adm'rs, §§339–341. Our statute has changed the common law, and requires the executor or administrator to apply to the ordinary for leave to sell (which application in the case of personal property shall be made at least ten days before the order is granted), and that advertisement be made of the day and time of sale. The intention of the law of this State seems to be that all sales of the property of decedents shall be public, after full notice to all parties interested therein. Annual crops, however, are exempted from these rules, and executors and administrators are allowed to send them off to market. Code, §2555.

It is insisted by counsel for the plaintiffs in error

that this cotton, which was lost by the sinking of the steamer, was part of an annual crop; that under this exception to the general rule, Seabrook, the administrator, had authority to send it off to market, and that Liverpool being a cotton·market, he had authority to send it thither; that as long as the code does not say what market, it is in the discretion of the administrator to send it to any market to which, in his opinion, it is for the best interest of the estate to send it.   We cannot agree with counsel for the plaintiffs in error in this view of the law.  We think that the market meant in this section of the code is a domestic market, a market within the jurisdiction of the courts of this State.   The intention of the law is to control executors and administrators in the administration of the assets of the estate.

The law did not mean, in our opinion, by this exception to allow administrators at their discretion to send annual crops to any markets but those in the jurisdiction of the State.   It could not mean to allow them, at their discretion, to send crops beyond the jurisdiction of the State.   If an administrator could send to Liverpool at his discretion, there is no reason why he should not send to Italy, Russia or China.   The law requires him to make annual returns to the court of ordinary, and if he should sell annual crops, he is required, when his return is made, to submit vouchers to the ordinary, showing the quantity of cotton, the price at which it was sold, the name of the purchaser and the time of sale.   Code, §2529.   The sale of the annual crops being a private sale, this provision was doubtless made to compel the administrator to make a full showing in regard to such sale, in order that persons interested in the estate might for themselves examine into the sale. If the law is complied with, full *data* are given to all persons interested, whereby they can make this exam-

ination. By such examination they can ascertain the quantity of the cotton, the price, the purchaser and the time when sold. This requirement is a strong circumstance going to show that the law intended the market to be a domestic one. If it were a foreign market, this section of the code could scarcely be complied with by the administrator; and it would in most cases be impossible for persons interested in the estate to have an opportunity of making the examination which this section evidently intends to give them. They could not without great expense visit foreign countries to make this examination. We therefore think that the law and the public policy of the State forbid executors and administrators from removing the assets of the estate from the jurisdiction of the State. If, therefore, an executor or administrator sends the assets of the estate beyond the jurisdiction of the State, it is an illegal act, and a *devastavit per se*, and no evidence of good faith or good intention should be received in order to relieve the administrator from his illegal act.

Nor would the fact that the administrator was shipping the cotton in order to prevent its being seized by the treasury agents of the government, relieve him. The presumption is that cotton seized by the agents of the government is legally seized; if illegally seized, the administrator would have his remedy. No court could countenance such an excuse as this; no court could hold that any person would be justified in running property away to avoid seizure by the government.

If these views are sound, of course the court did not err in refusing to give the contrary principle in charge, as complained of in the 9th ground of the motion for a new trial; nor in ruling out the evidence of Billups as complained of in the 12th ground, or the evidence of Vason to the same effect as complained of in the 7th

ground. Nor did the court err in his ruling upon the evidence of Vason as complained of in the 8th ground. Taken in connection with the evidence already adduced on the trial, it was not such newly discovered evidence as would authorize the grant of a new trial as required by the act of 1885. (Acts 1885, p. 98.)

2. The court did not err in refusing to give in charge the request set out in the 10th ground of the motion. It appears that Seabrook, the administrator, hired laborers and carried on the farm of Dawson in the year 1866 without the approval of the court of ordinary, and the court refused to charge that the amount lost by Seabrook for that year in carrying on the farm should be allowed him by the jury. Such contracts by the administrator can only be charged up and bind the estate when the same are made with the approval of the ordinary of the county. Of course if he had no such approval, and loss was sustained, it would not fall upon the estate; and the court was right in refusing to give the request in charge. Code, §2546; *Johnson vs. Parnell*, 60 *Ga.* 661.

3. The next point relied on by counsel for the plaintiff in error was, that the court erred in striking the 4th plea. That plea, in substance, averred that Brown, the defendant in error, was the administrator of one Strain, as well as administrator of Dawson; that Strain was a co-surety with these plaintiffs in error; that Strain having died and Brown having administered on his estate, distributing the assets of that estate to the heirs and creditors of Strain, with a full knowledge of Strain's liability as a co-surety upon the administrator's bond of Seabrook, he being a plaintiff in the suit on his bond as administrator of Dawson, these plaintiffs in error were thereby released to the extent of the value of the assets of Strain's estate paid out by him. We

think the court did not err in striking this plea. Brown as administrator of Strain, was in law a different person from Brown as administrator of Dawson. When he distributed the assets of Strain, he did not do so in the character or capacity of administrator of Dawson, but as administrator of Strain. In making this distribution of Strain's assets, he was not acting as administrator of Dawson; it was not any act of his as a representative of Dawson's estate, and consequently not that of a creditor of these parties as debtors of that estate. It was just the same in law as if A had been the administrator of Strain, and B the administrator of Dawson: A's act in distributing the assets of Strain could not in any way affect the sureties on Seabrook's bond made for the benefit of Dawson's estate, although Strain may have been a co-surety on that bond. It was no part of the duty of B to look after the protection of the sureties upon Seabrook's bond, but that duty devolved upon themselves.

4. The evidence was sufficient to authorize the verdict of the jury.

5. Having affirmed the judgment complained of in the original bill of exceptions, the cross-bill of exceptions is dismissed.

Judgment affirmed.